James H. Power
Marie E. Larsen
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Telefax: 212-385-9010
Email: james.power@hklaw.com
        marie.larsen@hklaw.com

*Attorneys for Plaintiff*
*Conti 149 Conti Guinea*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————

CONTI 149 CONTI GUINEA,
Individually and on behalf of M/T CONTI
GUINEA (IMO No. 9391402)

                                    Plaintiff,

        - against -

O.W. BUNKER PANAMA S.A., O.W. BUNKER
USA INC., CLEMENTI PARK SHIPPING CO.
PTE LTD., ING BANK N.V.

                                    Defendants.

—————————————————————

14 Civ. _____ (    )

**COMPLAINT
FOR INTERPLEADER**

        Plaintiff Conti 149 Conti Guinea ("Plaintiff" or "Owner"), individually and as owner of

the vessel M/T CONTI GUINEA, by and through its attorneys Holland & Knight LLP, brings this

action pursuant to Rule 9(h), as and for its Complaint for Interpleader pursuant to 28 U.S.C. §§

1335(a) and 2361 alleges, upon information and belief, as follows:

## THE PARTIES

        1.      Plaintiff is a foreign corporation or business entity organized and existing pursuant

to the laws of a foreign country.

2.      The vessel M/T CONTI GUINEA (IMO No. 9391402) (the "Vessel") is a party in interest in this proceeding as it is the subject of one or more lien claims against it *in rem*.  The CONTI GUINEA is a Liberia-flagged tanker.

3.      UPT Pool Ltd. ("UPT Pool") is a party in interest in this proceeding and at all materials times was the charterer of multiple similar vessels including the M/T CONTI GUINEA which it operates in a pool (i.e., a consortium or group) of vessels designed to load cargoes on various vessels based on location and market factors.  UPT Pool, as pool manager is a foreign corporation or business entity organized and existing pursuant to the laws of a foreign country.  UPT Pool is the contractual counterparty for the sale of bunkers at issue in this interpleader action.

4.      Defendant O.W. Bunker Panama S.A. (O.W. Panama) is a corporation or business entity organized and existing pursuant to the laws of Panama, with an office and place of business at 5282 Calle Luis Urriola, Diablo Heights, Ancon, Panama.

5.      Defendant O.W. Bunker USA Inc. ("O.W. USA") is a corporation or business entity organized and existing pursuant to the laws of Texas the with its principal place of business at 2603 August Drive, Suite 440, Houston, TX 77057.

6.      Defendant Clementi Park Shipping Co. Pte Ltd. ("Clementi") is a corporation or business entity operating in the U.S. offshore bunkering business, organized and existing pursuant to the laws of a foreign jurisdiction, with an office and place of business at 152 Beach Road #31-01, Gateway East, Singapore 189721.

7.      Defendant ING Bank N.V. ("ING") is a bank organized and existing pursuant to the laws of the Netherlands with an office and place of business located at Amsterdamse Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands.

#34117006_v2

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and Fed.R.Civ.P. 9(h),  inasmuch as it involves the interpleader of funds in the possession of Plaintiff for the payment pursuant to a bunker supply contract for the provision of necessaries (i.e., fuel oil or bunkers) to the vessel M/T CONTI GUINEA  (the "Vessel").

9.     This Court has original jurisdiction over this interpleader action pursuant to 28 U.S.C. § 1335(a) in that for the bunker payment in question: (a) at least two of the claimants are of diverse citizenship; (b) the dispute between the claimants involves funds in an amount exceeding $500.00, exclusive of interest and costs; and (c) Plaintiff, on behalf of the M/T CONTI GUINEA is the stakeholder of the funds and, concurrently with the filing of this Complaint, will seek to make a deposit in the Court's Registry in the sum of $258,766.83, which is the amount due for the fuel delivered to the M/T CONTI GUINEA on October 20, 2014.

10.     This Court has personal jurisdiction over defendants O.W. Panama and O.W. USA pursuant to the terms of the applicable bunker supply contract, wherein the O.W. entities have selected the District Court for the Southern District of New York as the location for dispute resolution.

11.     This Court has personal jurisdiction over defendant Clementi pursuant to its supply of bunker fuel in the United States offshore area (Galveston, Texas) which is the subject of this interpleader action.

12.     This Court has personal jurisdiction over defendant O.W. USA pursuant to 28 U.S.C. §2361.

#34117006_v2

13.    This Court has personal jurisdiction over ING Bank N.V. to the extent it is or may be a third-party beneficiary of the bunker supply contract at issue in this dispute and to the extent that it is an alleged assignee of the receivables of O.W. Panama and/or O.W. USA.

14.    Venue is properly laid in this Court pursuant to 28 U.S.C. § 1397.

### NATURE OF ACTION

15.    This is an action for interpleader with respect to the sum of $258,766.83, representing the amount due under an invoice for the supply of bunkers to the vessel M/T CONTI GUINEA.  With respect to payment of the invoice, O.W. Panama, O.W. USA, Clementi, ING Bank N.V. or some other third party may have conflicting claims as to ownership of the fuel payment funds owed by Owner and/or UPT Pool for the purchase of and receipt of a specific quantity of bunkers (fuel) in the Port of South Sabine Point, located offshore Texas for the vessel M/T CONTI GUINEA, delivered to the Vessel on October 20, 2014 (the "Fuel Delivery").

### FACTUAL BACKGROUND

16.    On or about October 18, 2014 UPT Pool ordered bunkers to be loaded onboard and consumed by the Vessel from O.W. USA.  The bunkers were supplied to the Vessel within the Port of South Sabine Point.  A true copy of the Sales Order Confirmation is attached hereto as Exhibit 1.

17.    The bunkers were delivered to the Vessel on October 20, 2014.  A bunker delivery receipt was issued by O.W. Panama.  A true copy of the bunker delivery receipt is attached hereto as Exhibit 2.

18.    The bunker delivery receipt notes that Clementi is the supplier of the bunkers, delivered by the bunkering barge, ELISALEX SCHULTE.

#34117006_v2

19.     On October 20, 2014 UPT Pool received an invoice requesting payment for the October 20, 2014 Fuel Delivery, requesting payment of $258,766.83 to be paid to O.W. USA for the supply of bunkers to CONTI GUINEA.  A true copy of the bunker invoice is attached hereto as Exhibit 3.

20.     The standard terms and conditions of all O.W. Bunker entities for the sale of bunkers includes clause P.5: "Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim aris[ing] in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York."  A true copy of the O.W. Bunker terms is attached hereto as Exhibit 4.

21.     On or about November 13, 2014, O.W. USA, O.W. North America Inc. ("O.W. North America") and O.W. North America Holding Inc. ("O.W. Holding") all filed voluntary petitions pursuant to Chapter 11 in the United States Bankruptcy Court for the District of Connecticut as Case Nos. 14-51720, 14-51721 and 14-51722.[1]

22.     Pursuant to an Omnibus Security Agreement dated December 19, 2013 between O.W. Bunker & Trading A/S ("O.W. Denmark") and its subsidiaries (believed to include O.W. Panama, O.W. USA, O.W. North America and O.W. Holding), and ING as Security Agent, the O.W. entities have allegedly assigned certain rights in respect of their supply contracts as security to ING.

---

[1] Plaintiff respectfully submits that this interpleader action does not violate the automatic stay imposed by the Bankruptcy Code, 11 U.S.C. § 362.  *See Price & Pierce Int'l, Inc. v. Spicers Int'l Paper Sales, Inc.*, 50 B.R. 25, 26 (S.D.N.Y. 1985) (as debtor was in reality nominal defendant in interpleader action, interpleader action did not violate automatic stay).

#34117006_v2

23. Due to the bankruptcy filings of O.W. Denmark, O.W. USA, O.W. North America, O.W. Holding, and other O.W. group entities, it is possible that O.W. Panama, Celementi or ING or any one of the numerous O.W.-related subsidiaries or parent corporations will seek to collect amounts allegedly owed to them arising from or related to the supply of bunkers to the Vessel.

### POSSIBLE ARREST OF VESSEL AND NECESSITY OF INTERPLEADER

24. Under United States maritime law the contract supplier of necessaries, including fuel, to a vessel obtains a maritime lien against that vessel in most circumstances. Additionally, under certain circumstances, a physical supplier of the fuel (such as O.W. Panama or Clementi) may also assert a maritime lien on that vessel in some circumstances

25. Moreover, other parties, such as ING, may be expected to assert a right to the bunker payment based on ING's numerous demands for payment in other cases. Upon information and belief ING's claims are based on assignments of receivables by various O.W. entities including but not limited to O.W. USA and O.W. North America.

26. The Vessel trades in the United States, as evidenced the location of the fuel delivery at issue, and is due to call at various ports in the United States and elsewhere and could face arrest pursuant to Supplemental Admiralty Rule C by any of the defendants claiming to assert a maritime lien,[2] which would cause harm to Plaintiff owner and UPT Pool, delay the Vessel, affect innocent third parties with interests in the Vessel's cargo and generally inhibit and interfere with maritime commerce.

---

[2] Plaintiff makes no assertion nor takes a position as to the validity of any of the potentially asserted maritime liens or other claims by any of the Defendants or whether O.W. USA or O.W. North America have validly assigned any maritime lien claim to ING. This issue is a matter to be decided by the District Court or other court having jurisdiction over the underlying claims by and between the claimants.

#34117006_v2

27.     Plaintiff itself or its representative for payment presently has control over the funds invoiced for the Fuel Delivery to the Vessel.  Plaintiff disclaims any interest in the amount invoiced for the supply of bunkers to the Vessel.

28.     Plaintiff cannot ascertain whether the amount owed should be paid to O.W. Panama, O.W. USA, Clementi or ING in order to extinguish all maritime liens and/or other claims against the vessel Owner, UPT Pool and the Vessel and to prevent its arrest in this District or elsewhere and claims for payment on the Fuel Delivery and extinguish claims against any of the interested parties for double payment for the Fuel Delivery.

29.     The competing claims of the Defendants or other third parties may expose Plaintiff, UPT Pool and the vessel M/T CONTI GUINEA to multiple liability in connection with the payment of the bunker invoice in order to extinguish competing maritime lien claims and/or other *in personam* or non-maritime claims.

30.     Plaintiff, acting as owner and on behalf of the vessel M/T CONTI GUINEA is entitled to deposit with the Court the sum of $258,766.83, representing the amount due pursuant to the invoice issued by O.W. USA for the Fuel Delivery, and require that O.W. Panama, O.W. USA, Clementi, ING and any other claimant interplead among themselves to establish their respective rights to the invoice funds.

31.     Further, in order to comply with the requirements of Supplemental Admiralty Rule E(5)(a) and for the funds deposited into the registry to constitute security for the *in rem* claims of the claimants and to act as the substitute *res* against which claimants must assert their maritime liens for the Fuel Delivery, Plaintiff is prepared to deposit an additional amount constituting 6% interest per annum or such other amount as the court deems just and proper.  This amount is calculated to be $274,292.84, inclusive of one year of interest.

7

32.     After depositing the sum of $274,292.84 with the Court, Plaintiff and UPT Pool are entitled to be discharged from further liability with respect to the funds. The Vessel is similarly entitled to be discharged from any maritime lien against it arising from the supply of bunkers as described herein and as reflected in Exhibits 1-3.

WHEREFORE, Plaintiff Conti 149 Conti Guinea, individually as owner and on behalf of the vessel M/T CONTI GUINEA respectfully requests that this Court:

(i)     determine which of the defendants is entitled to the Fuel Delivery funds, or, in the alternative, the share of each defendant, if any, or hold the Fuel Delivery funds until such time as a determination by another court of competent jurisdiction makes such a determination;

(ii)     enjoin O.W. Bunker Panama S.A., O.W. Bunker USA Inc., Clementi Park Shipping Co. Pte Ltd. and ING Bank, N.V. from commencing any action against Conti 149 Conti Guinea, UPT Pool Ltd. or the vessel M/T CONTI GUINEA *in rem*, including but not limited to the arrest of the Vessel M/T CONTI GUINEA in any port, pursuant to Supplemental Admiralty Rule C based on the assertion of any *in rem* claim for the provisions of the bunkers referred to herein as the Fuel Delivery;

(iii)     discharge Conti 149 Conti Guinea and UPT Pool Ltd. from any liability on any claim that has been made or may in the future be made for the Fuel Delivery upon Plaintiff's deposit of $274,292.84 into this Court's registry, or such other amount the Court finds sufficient to discharge the M/T CONTI GUINEA from liability for the Fuel Delivery;

(iv)     discharge the vessel M/T CONTI GUINEA from any liability on any claim that has been made or may in the future be made for the Fuel Delivery upon Plaintiff's deposit of $274,292.84 into this Court's registry;

(v)     award Plaintiff its costs and attorneys' fees in this action; and

(vi)    award Plaintiff such other and further relief which this Court may deem just and

proper.

Dated:  New York, New York
        December 23, 2014

                                HOLLAND & KNIGHT LLP


                                By: _____
                                James H. Power
                                Marie E. Larsen
                                31 West 52nd Street
                                New York, New York 10019
                                Telephone:  212-513-3200
                                Telefax: 212-385-9010
                                Email:  james.power@hklaw.com
                                        marie.larsen@hklaw.com

                                *Attorneys for Plaintiff Conti 149 Conti Guinea*

#33996227_v2

9

#34117006_v2

# EXHIBIT 1

# O.W. Bunker USA Inc.

**W Bunker**

UPT Pool Ltd
10-12 Emanuel Rhoides Str
3031 limassol
Cyprus
Mr  Marcus Jasca

2603 Augusta Drive
Suite 440
Texas 77057 Houston
USA
Phone  +1 281 946 2300
Fax  +1 281 946 2301
Internet  http //www owbunker com
EIN  99-0373556
ING Bank N V
IBAN  NL26 INGB 0020 1180 31
IBAN  NL10 INGB 0651 3696 81
SWIFT  INGBNL2A
IBAN  NL26 INGB 0020 1180 31
SWIFT  INGBNL2A

## Sales Order Confirmation

| | |
|---|---|
| Sales Order No. | **190-10971** |

We are hereby pleased to acknowledge receipt of your order as follows

HOUSTON  18  October 2014

| | |
|---|---|
| Vessel | CONTI GUINEA (IMO  9391402) |
| Port | SOUTH SABINE POINT |
| Delivery date | Between 20  October 2014 and 21  October 2014 |
| Seller | O W  Bunker USA Inc |
| Your ref. | |
| Account | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV CONTI GUINEA AND/OR UPT POOL LTD |

| Quantity | Unit | Product / Quality | Curr | Price | Unit | Supplier |
|---|---|---|---|---|---|---|
| 300,00 | MT | 380-CST 1% | USD | 529,00 | MT | O W  Bunker USA  Inc Delivery  Barge |
| 200,00 | MT | Fueloil 380-CST 3,5% | USD | 498,00 | MT | O W  Bunker USA  Inc Delivery  Barge |

| | |
|---|---|
| **Agent** | |
| Payment | WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX)  COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME |
| Remarks | ISO 8217 2010 (E) RMG 380 3 5% |
| | $500 sample transfer fee if applicable |
| | Agents  as per calling instructions |
| | Gasoil to be reconfirmed oct 18th |

We thank you for this nomination.

Kind Regards

Donald Morales

| | |
|---|---|
| Direct | +1 281 946 2375 |
| Mobile | +1 832 795 1707 |
| Yahoo ID | domo_owbunker |
| E-Mail | domo@owbunker com |
| Office E-Mail | houston@owbunker com |

# O.W. Bunker USA Inc.



TERMS AND CONDITIONS.
------------------------------------------------

SAMPLES:

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

TERMS:

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as ´Buyer´ and to O.W. Bunker USA Inc. as ´Seller´.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

GUIDELINES FOR RECEIVING BUNKERS:

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

OTHERWISE:

Any errors or omissions in above Confirmation should be reported immediately.


PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.

# O.W. Bunker USA Inc.



GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

BEFORE BUNKERING:

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

DURING BUNKERING:

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes.  All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air  is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain  the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

AFTER COMPLETION:

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

**O.W. Bunker USA Inc.**



QUANTITY COMPLAINTS:

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.

# EXHIBIT 2

# O.W. Bunker Panama S.A.

5282 Calle Luis Urriola
Diablo Heights
Ancon
Panama



## Bunker delivery receipt  1274798

| | | | |
|---|---|---|---|
| Delivery date | **20-Oct-14** | Alongside | **20:00** |
| Receiving vessel | **CONTI GUINEA** | Hose connected | **20:48** |
| IMO number | **9391402** | Commenced pumping | **21:00 / 22:18** |
| Flag | **LIBERIA** | Completed pumping | **22:06 / 23:06** |
| Port/location | **GOLA** | Hose disconnected | **23:30** |
| Bound for | **BEAUOMONT** | Departure | **23:48** |
| Delivered by | **ELISALEX SCHULTE** | | |

| Description<br>Product delivered | Litres<br>Net @ 15°C | BBLS<br>Net | Metric tons in air<br>(3 decimal) | BBLS<br>Gross |
|---|---|---|---|---|
| LSRMG380 | 307655 | 1936.032 | 300.569 | 1981.472 |
| HSRMG380 | 202930 | 1276.981 | 200.333 | 1302.828 |
| | | | | |
| | | | | |

| | LSRMG380 | HSRMG380 | Fuel Oil | Gas Oil |
|---|---|---|---|---|
| Kinematic viscosity @ 50°C | 302.8 | 341.9 | | |
| Density in kg/m³ @ 15°C per ISO 3675 | 978.2 | 987.9 | | |
| Water content, % | <0.05 | 0.10 | | |
| Sulphur content in % per ISO 8754 | 0.938 | 3.38 | | |
| Flash point °F | 202.1 | 169.9 | | |
| Pour point, °F | 27 | 16 | | |
| API Gravity @°F | 13.1 | 11.6 | | |
| Ash content | 0.032 | 0.066 | | |
| Delivered temperature,°C | 52 | 50 | | |

**Sample seal numbers**

| | LSRMG380 | HSRMG380 | | |
|---|---|---|---|---|
| Receiving vessel | 1274797 | 1287305 | | |
| Marpol sample<br>To Laboratory | 1274798 | 1287306 | | |
| Barge | 1274799 | 1289789 | | |
| Extra | | | | |

| Remarks |
|---|
| |

Received the above in good condition
Also received two representative drip samples each grade collected from ship manifold whilst bunkering
Page 1  Administration  Page 2  Barge  Page 3 Receiving vessel  Page 4  Receiving vessel
"Fuel oil supplied is in conformity with Marpol regulation 14(1) and 18(1)  According to regulation 4(a), the sulphur
content of fuel oil used on board ships in a SOx emission control area must not exceed 1,0 % m/m"

Suppliers stamp and signature          Vessels stamp          Signature chief engineer/Master

# O.W. Bunker Panama S.A.

5282 Calle Luis Urriola
Diablo Heights
Ancon
Panama



## Bunker requisition form

The Chief Engineer

| | | | |
|---|---|---|---|
| M/V | **CONTI GUINEA** | Date | **20-Oct-14** |
| Port/location | **GOLA** | IMO Number | **9391402** |

Dear Sir,
We have been nominated to supply You with the following grade/s of bunkers

| | | | |
|---|---|---|---|
| 300 | Tonnes Marine Fuel Oil of | 302.8 | cSt |
| 200 | Tonnes Marine Fuel Oil of | 341.9 | cSt |
| N/A | Tonnes Marine Diesel Oil | N/A | cSt |
| N/A | Tonnes Marine Gas Oil | N/A | cSt |

You or Your representative is hereby invited onboard our barge before commencement and after completion
of bunkering for the purpose of measuring our tanks, as the barge figures deemed to be final and binding
We undertake to supply You with the above grade/s of bunker
Basic characteristics of the bunker are as follows

| | LSRMG380 | HSRMG380 | Fuel Oil | Gas Oil |
|---|---|---|---|---|
| Kinematic viscosity @ 50°C | 302.8 | 341.9 | | |
| Density in kg/m³ @ 15°C per ISO 3675 | 978.2 | 987.9 | | |
| Water content, % | <0.05 | 0.10 | | |
| Sulphur content in % per ISO 8754 | 0.938 | 3.38 | | |
| Flash point, °F | 202.1 | 169.9 | | |
| Pour point  °F | 27 | 16 | | |
| API Gravity @°F | 13.1 | 11.6 | | |
| Ash content | 0.032 | 0.066 | | |
| Delivered temperature, °C | 52 | 50 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| We will supply | LS RMG 380 | first, followed by | HS RMG 380 | and | N/A | and  N/A |

The rated pumping capacity of our bunker tanker is _____700_____ tonnes per hour

1) What pumping pressure do You require?

| | | | | |
|---|---|---|---|---|
| Marine Fuel Oil | | Bar | **Next port:** | BEAUOMONT |
| Marine Diesel Oil | N/A | Bar | **Flag:** | LIBERIA |
| Marine Gas Oil | N/A | Bar | | |

2) Will You be witnessing the dipping of our tanks?  ☐ Yes ☐ No ☐ NA

3) Will You be witnessing our monitor reading?  ☐ Yes ☐ No ☐ NA

4) Will You be witnessing our dripsampling?  ☐ Yes ☐ No ☐ NA

Acknowledged and fully accepted by

Master / vessels stamp / Signature chief engineer

CHIEF ENGINEER ПОДПИ

Signature barge master / chief officer

SANGALOS BROS

# EXHIBIT 3



M/V  CONTI GUINEA
AND/OR OWNERS/CHARTERERS

UPT Pool Ltd.
10-12 Emanuel Rhoides Str
limassol, 3031
Cyprus

| | |
|---|---|
| **DATE OF INVOICE** : | **20. October 2014** |
| **INVOICE NO** : | **190-11117** |
| ORDER NO. : | 190-10971 |
| DATE OF SUPPLY : | 20. October 2014 |
| **DUE DATE** : | **18. November 2014** |

PORT:  SOUTH SABINE POINT
YOUR REFERENCE:

| Quantity supplied | Quality/description | Price/per | Invoice amount |
|---|---|---|---|
| 200.333  MT | Fueloil 380-CST 3,5% | 498.00  MT | 99,765.83 |
| 300.569  MT | 380-CST 1% | 529.00  MT | 159,001.00 |

| | | | |
|---|---|---|---|
| Your VAT No | | VAT Amount   USD | 0.00 |
| Our VAT No.   99-0373556 | | Total   USD | 258,766.83 |

The prices are excl. all taxes and/or other fees.

**TERMS OF PAYMENT** 30 days from date of supply With value date not later than DUE DATE or previous working day
when it is a holiday  In case of delays in payment interest will be charged in accordance with our valid General Terms and Conditions

| | | |
|---|---|---|
| **BANK:** | ING Bank N.V. | |
| **ACCOUNT:** | IBAN: NL26 INGB 0020 1180 31 | USD and all other currencies |
| | IBAN: NL10 INGB 0651 3696 81 | EUR |
| | SWIFT· INGBNL2A | |

**O.W. BUNKER USA INC.**
2603 Augusta Drive
Suite 440
USA-TX 77057  Houston

Phone  +1 281 946 2300
Fax  +1 281 946 2301

Internet  http //www owbunker com

EIN  99-0373556

Per telegraphic transfer directly to our account without deduction
of bank charges which are for buyers account

# EXHIBIT 4

# OW BUNKER GROUP

## Terms and Conditions of sale for Marine Bunkers
## Edition 2013

## A.     GENERAL INTRODUCTION

A 1     This is a statement of the terms and conditions according to which the
International O W Bunker Group (hereinafter called 'OWB') will sell marine bunkers

A 2     These conditions apply to all offers quotations orders agreements services and all subsequent
contracts of whatever nature except where otherwise is expressly agreed in writing by OWB

A 3     General trading conditions of another party will not apply unless expressly accepted in writing by OWB

A 4     In the case that for whatever reason one or more of the (sub)clauses of these general conditions are
invalid the other (sub)clauses hereof shall remain valid and be binding upon the parties

## B     DEFINITIONS

B 1     Throughout this document the following definitions shall apply

| | |
|---|---|
| Seller | means OWB any office branch office affiliate or associate of the OWB Group being the legal entity within the OWB Group whose name is included in the Order Confirmation sent to the Buyer |
| Buyer | means the vessel supplied and jointly and severally her Master Owners Managers/Operators Disponent Owners Time Charterers Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers quotations orders and subsequent agreements or contracts have been made |
| Bunkers | means the commercial grades of bunker oils as generally offered to the Seller s customers for similar use at the time and place of delivery and/or services connected thereto |
| Owner | means the registered Owner Manager or Bareboat Charterer of the vessel |
| Vessel | means the Buyer s Vessel Ship Barge or Off Shore Unit that receives the supply/bunkers either as end user or as transfer unit to a third party |
| Nomination | means the written request/requirement by the Buyer to the Seller for the supply of the Bunkers |
| Order Confirmation | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers In case of conflict between the Nomination and the Order Confirmation unless the Seller otherwise agrees in writing the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement |
| Agreement | means the concluded terms for the sale/purchase of the Bunkers |
| Supplier | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers |
| GTC | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| BDR | means the Bunker Delivery Receipt being the document(s) which is/are signed by the Buyer s representative(s) at the place of the supply of the Bunkers to the Vessel evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel |

## C     OFFERS, QUOTATIONS AND PRICES

C 1     An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order
Confirmation to the Buyer Each Order Confirmation shall incorporate these GTC by reference so that the
GTC are considered a part of the Confirmation

C 2     Agreements entered into via brokers or any other authorised representative on behalf of the Seller shall
only bind the Seller upon the Sellers broker or other authorised representative sending the Order
Confirmation to the Buyer or the Buyer s broker as the case may be

C 3     The Seller s offer is based on the applicable taxes duties costs charges and price level of components
for Bunkers existing at the time of the conclusion of the Agreement Any later or additional tax
assessment duty or other charge of whatever nature and however named or any increase of
components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change
in the Seller s contemplated source of supply or otherwise coming into existence after the Agreement
has been concluded shall be added to the agreed purchase price provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances

C 4 All prices and/or tariffs are exclusive VAT unless specifically stated otherwise Any VAT or other charge and/or tax applicable and whenever imposed shall be promptly paid by the Buyer and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum

C 5 If the party requesting Bunkers is not the Owner of the Vessel the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time if such payment guarantee is not received upon request thereof from the Seller to the Owner The Seller s decision to forego obtaining a payment guarantee under this Clause C 5 shall have no effect on Seller s right to a lien on the Vessel for any Bunkers supplied under this Agreement

C 6 The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement If the party requesting Bunkers is not the Owner of the Vessel Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery

C 7 If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory the Seller may require cash payment or security to be provided by the Buyer prior to delivery failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors


# D      SPECIFICATIONS (QUALITY – QUANTITY)

D 1 The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise This includes but is not limited to the quality sulphur content and any other specific characteristics of the Bunkers whatsoever Any and all warranties regarding the satisfactory quality merchantability fitness for purpose description or otherwise are hereby excluded and disclaimed
Where specifications designate a maximum value no minimum value is guaranteed unless expressly stated in the Order Confirmation and conversely where minimum values are provided in a specification no maximum values are guaranteed unless expressly stated in the Order Confirmation

D 2 The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller s Order Confirmation Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum

D 3 Where standard specifications are being given or referred to tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever

D 4 In respect of the quantity agreed upon the Seller shall be at liberty to provide and the Buyer shall accept a variation of 5% from the agreed quantity with no other consequence than a similar variation to the corresponding invoice from the Seller

D 5 Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered All grades of produce may contain petroleum industry allo×ed bio der ved components


# E      MEASUREMENTS – NON CLAUSING OF THE BDR(S)

E 1 The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge tank truck or of the shore tank in case of delivery ex wharf

E 2 The Buyer s representative shall together with the Seller s representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied Quantities calculated from the Receiving Vessel s soundings shall not be considered

E 3     Should the Buyer s representative fail or decline to verify the quantities  the measurements of quantities made by the Seller or the Supplier shall be final, conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance

E 4     The Buyer expressly undertakes not to make any endorsement  complaint/ comment (including but without limitation any "No-lien  clausing") on the BDR when presented for signature by the Buyer s representative(s)  any such insertion shall be invalid and of no effect whatsoever

E 5     In the event of complaint/comment on the quantity of Bunkers delivered  the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately, followed by a complaint in detail to the Seller  setting out the exact quantity(ies) claimed shortsupplied  and with full supporting vouchers  in writing within 7 (seven) days thereof  failing which  any such claim by the Buyer shall be extinguished as non existent  and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier  the relevant claim being time barred  and the Seller/Supplier's weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered


## F.     SAMPLING

F 1     The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation  The Buyer's representative has the responsibility to witness that such samples are drawn  correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles

F 2     In case that dripsampling is not available onboard the barge  tanktruck or shore tank  samples shall be taken as a composite of each tank from which supplies are made  onboard the barge (respectively at the shore tank or tanktruck)  divided with 1/3 from each the top  mid and bottom of the tanks

F 3     The samples shall be securely sealed and provided with labels showing the Vessel s name  identity of delivery facility  product name  delivery date and place and seal number  authenticated with the Vessel's stamp and signed by the Seller s representative and the Master of the Vessel or his representative  The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts  and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F

F 4     Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers  or if requested by the Buyer in writing  for as long as the Buyer reasonably required  The other two (2) samples shall be retained by the receiving Vessel  one of which being dedicated as the MARPOL sample

F 5     In the event of a dispute in regard to the quality of the Bunkers delivered  the samples drawn pursuant to this Chapter F  shall be conclusive and final evidence of the quality of the Bunkers delivered  One  and only one  of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests  the result of which is to be made available to both parties  Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested  The parties are to use best endeavours to agree the independent laboratory to perform the tests  If, however  no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested  the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted  and those test result will be final and binding upon Buyer and Seller as set out above

F 6     The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present  or fails to be present at the appropriate time and place  and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking

F 7     No samples subsequently taken shall be allowed as (additional) evidence  If any of the seals have been removed or tampered with by an unauthorised person  such sample(s) shall be deemed to have no value as evidence

F 8     Any eventual samples drawn by Buyer's personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied  The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms  Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels

**G**      **DELIVERY**

G 1      The time of delivery  as given by the Seller  has been given as an approximate time  unless it has been otherwise specifically agreed in writing between the parties

G 2      The time of delivery will only be binding upon the Seller when all information necessary for the Seller to comply with its obligations hereunder  have been properly delivered to the Seller in reasonable time before the delivery  In the event the Nomination addresses a spread of dates for delivery  the Seller has the sole discretion to commence the delivery within any time  day/night/sshinc of these dates  always subject to the circumstances set out below in Clause G 3

G 3      The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit having regard to congestion affecting the delivery facilities of Seller  its Suppliers or Agents and to prior commitments of barges or other delivery means  The Seller and/or the Supplier shall not be liable for any consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion of bunkering  and unless otherwise agreed in writing  the Seller shall not be obligated to deliver prior to the nominated date or spread of dates  The Seller is not responsible for delays caused by local customs pilots  port  or other authorities

G 4      In any case the Buyer  unless otherwise agreed in writing  must give not less than 72 (seventy two) hours approximate notice of readiness of the Vessel for delivery  which is to be followed by 48 (forty eight) hours and 24 (twenty four) hours such notices  where the last notice must also specify the exact place of delivery  All these notices must be given to the Sellers and the Seller s representatives/agents in writing

G 5      The Seller shall be entitled to deliver the Bunkers by separate part deliveries  in which case each part delivery shall be construed as a separate delivery

G 6      The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit required for such purpose has not been obtained in due time before the delivery

G 7      If the Seller at any time for any reason believes that there may be a shortage of supply at any place and that as a result thereof it may be unable to meet the demands of all its customers  the Seller may allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it may determine appropriate in its sole discretion

G 8      The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the circumstances permit  The Seller and/or the Supplier shall not be liable for any demurrage paid or incurred by the Buyer or for any loss  damage or delay of the Vessel (consequential and/or liquidating damages included) of any nature whatsoever due to congestion at the loading terminal  prior commitments of available barges or tank trucks or any other reason

G 9      The Buyer shall ensure that the Vessel provides a free  safe and always afloat and accessible side for the delivery of bunkers and that all necessary assistance as required by the Seller or the Seller s representative is rendered in connection with the delivery  If in the Supplier s opinion clear and safe berth is unavailable  delivery might be delayed or  in Seller s option  cancelled and all costs related to above will be on account of the Buyer

G 10     The Vessel shall moor  unmoor  hoist and lower bunkering hose(s) from the barge(s) whenever required by the Seller  Seller s representative or Supplier  free of expenses and in any way as may be requested to assist the barge equipment to a smooth supply  The Buyer shall make and be responsible for all connections and disconnections between the delivery hose(s) and the Vessel s bunker intake manifold/pipe and ensure that the hose(s) are properly secured to the Vessel s manifold prior to commencement of delivery
During bunkering the Vessel s scuppers must be safely blocked  which blocking must be made by the Vessel s own crew  Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks are properly checked and ready to receive the bunkers  including but not limited to ensuring proper opening/closing of relevant valves  without any risk for spillages  etc  during the bunkering
Local further special requirements for receiving bunkers must be followed strictly by the Vessel  whether advised or not by the Seller or the Seller s representative  as it is always the Vessel and the Buyer who remains solely responsible for the knowledge and awareness of such eventual additional requirements for safety reasons

G 11     In the event that the Vessel is not able to receive the delivery promptly  the Buyer is thereby in default and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and shall indemnify the Seller in each and every respect as a result thereof

G 12     Delivery shall be deemed completed and all risk and liabilities  including loss  damage  deterioration  depreciation  contamination  evaporation or shrinkage to the Bunkers delivered and responsibility for loss  damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank

G 13    If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered  the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price  The Seller may exercise this right without prejudice to the Seller s other rights for damages or otherwise pursuant to these conditions

G 14    The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers  and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer  The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment  for which the Bunkers are supplied  for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory  In the event the Bunkers are not considered satisfactory the Seller and Supplier are to be notified in writing immediately after such test period has expired  Otherwise  it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard

G 15    If delivery is required outside normal business hours or on local weekends  Saturday  Sunday  national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs

G 16    In the event the Bunker delivery is made by vessel or barge as a ship to ship transfer  any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident  is to be dealt with by the Owners directly with the owners of the units involved  and Seller/Supplier shall not be held nor be responsible for any such damages  It however  any of the involved units choose to pursue Seller and/or Supplier  Buyer will fully indemnify and hold Seller harmless in relation thereto

G 17    For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe  taking weather  swell and forecasts into consideration  Supplier/Seller not to be held responsible for any delays  demurrages  liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection  Supplies being always performed weather permitting

G 18    Without prejudice to any other article(s) herein  any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded

## H      TITLE

H 1     Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery  The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non payment

H 2     Until full payment of the full amount due to the Seller has been made and subject to Article G 14 hereof the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller  and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel  nor mix  blend  sell  encumber  pledge  alienate  or surrender the Bunkers to any third party or other Vessel

H 3     In case of non or short payment for the Bunkers by the Buyer  the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention  without prejudice to all other rights or remedies available to the Seller

H 4     In the event that the Bunkers have been mixed with other bunkers on board the Vessel  the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered

H 5     The provisions of this Chapter H do not prejudice or in any way limit the Seller s right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable)  wherever situated in the world  without prior notice

H 6     Where  notwithstanding these conditions  title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller  the Buyer shall grant a pledge over such Bunkers to the Seller  The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel  including any mixtures of the delivered Bunkers and other bunkers  Such pledge

will be deemed to have been given for any and all claims of whatever origin and of whatever nature that the Seller may have against the Buyer

H 7    For the avoidance of doubt where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement

I    **PAYMENT – MARITIME LIEN**

I 1    Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing

I 2    Payment shall be made in full without any set off counterclaim deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s)

I 3    (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying the Seller may require immediate full payment of all its invoices due and/or those not yet due or such security as it shall deem to be satisfactory
    (ii) In the event that the Buyer shall default in making any payment due the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs) or the Seller may in its discretion elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages including cancellation charges Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated
    (iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates whereupon sub clauses I 3 (i) and I 3 (ii) shall apply as appropriate
    (iv) Where the Buyer fails to pay timely the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim the Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer
    (v) All judicial and extrajudicial costs and expenses including pre action costs fees expenses and disbursements of the Seller s lawyers/attorneys at law incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions shall be for the Buyer s account immediately payable by the latter to the Seller In case of litigation the Buyers shall also pay all the relevant expenses to the Seller including but without limitat on all his reasonable attorneys/lawyers fees costs and disbursements

I 4    Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller If payment falls due on a non-business day the payment shall be made on or before the business day nearest to the due date If the preceding and the succeeding business days are equally near to the due date then payment shall be made on or before the preceding business day

I 5    Any delay in payment of the full sum due shall entitle the Seller to interest at the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1 50 per mton supplied or the equivalent thereof in local currency with a minimum administration fee of USD 350 00 for each delivery made All reasonable attorneys fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer

I 6    Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order (1) costs of any kind or nature including but not limited to legal costs and attorneys fees (2) interest and administrational fee and (3) invoices in their order of age also if not yet due or in Seller s sole discretion to specify a payment to any such invoice Seller considers relevant

I 7    All costs borne by the Seller in connection with the collection of overdue payments including those of the Seller s own legal and credit department and including but not limited to reasonable attorneys fees whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer including but not limited to reasonable attorneys fees shall be for the sole account of the Buyer

I 8    The Seller shall at all times in its absolute discretion be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer s obligations under the Agreement Failing the immediate provision of such security upon Seller s demand the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security

I 9      Where Bunkers are supplied to a Vessel in addition to any other security the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof including but not limited to the reasonable attorney s fees) such maritime lien afforded to the Seller over the Vessel In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law be it of the place of delivery or the flag of the Vessel or the place of jurisdiction and/or an arrest of the Vessel or otherwise howsoever

I 10     It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer according to these ordinary business terms agreed between them

## J      CLAIMS

J 1      In addition to the obligations referred to in Article E 4 and E 5 herein any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer or the Master of the Vessel to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest If the Buyer or the Vessel s Master fails to present such immediate notice of protest to the Seller or Supplier such claim shall be deemed to have been waived and shall be absolutely barred for all purposes

J 2      Always without prejudice to Article G 14 herein any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes

J 3      The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions whether or not it has any claims or complaints If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied the Seller or the Seller s nominated representative shall be entitled to board the Vessel and investigate the Vessel s records log books engine logs etc and to make copies of any such document the Seller or the Seller s nominated representative may consider necessary for its investigations connected to the case The Buyer shall allow this or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel s officers and crew in any such manner the Seller or Seller s nominated representative may require Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel s officers and crew shall constitute a waiver of the Buyer s claim

J 4      The Seller shall be allowed and the Buyer Owner Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller s representative to draw samples from the Vessel s storage tanks settling tanks and service tank and/or from before and after the Vessel s centrifuges to have extra tests carried out for such samples at independent laboratory

J 5      In each and every case any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller

## K      LIABILITY – LIMIT TO SELLER'S LIABILITY

K 1      The Seller and/or Supplier shall not be liable for damages of whatever nature including physical injury nor for delay of delivery of Bunkers or services no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel representatives Supplier or (sub)contractors

K 2      Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time loss of cargo or charter cancelling date loss of income or profit/earnings are excluded In any event and notwithstanding anything to the contrary herein liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel

K 3      The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers its Supplier agents Servants (sub)contractors representatives employees and the officers crews and/or other people whether or not on board of the Vessel(s) The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions Third party shall mean any other (physical or legal) person/company than the Buyer

K 4      No servant supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss damage or delay while acting in the course of or in connection with its employment and/or agency for the Seller Without prejudice to the above every exemption limitation condition and liberty herein contained and every right exemption from or limit to liability defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant representative or agent of the Seller and/or the Supplier acting as aforesaid

## L      EXEMPTIONS AND FORCE MAJEURE

L 1      Neither the Seller nor the Seller s Supplier shall be liable for any loss claim damage delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority or person purporting to act therefore or (b) when supply of the Bunkers or any facility of production manufacture storage transportation distribution or delivery contemplated by the Seller or Supplier is interrupted delayed by congestion or other event (also see Article G 3 above) or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption delay unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier including (without limitation) if such is caused wholly or partly by labour disputes strikes stoppages lock out governmental intervention wars civil commotion riot quarantine fire flood earthquake accident storm swell ice adverse weather or any act of God Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller s or the Supplier s normal practices Neither the Seller nor the Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time

L 2      If the Buyer exercises reasonable diligence the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure The Buyer shall indemnify the Seller or the Seller s supplier for any damage caused by the Buyer the Buyer s agent or employees in connection with deliveries hereunder

L 3      Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same However under no circumstances and for no reason whatsoever can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller

L 3      In the event that the Seller as a result of force majeure can only deliver a superior grade of bunkers the Seller is entitled to offer the said grade and the Buyer must accept delivery thereof and pay the applicable price

L 4      (a)      These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions In such circumstances these Terms and Conditions shall be varied accordingly and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party

     (b)      Without prejudice or limitation to the generality of the foregoing in the event that the third party terms include

     (i)      A shorter time limit for the doing of any act or the making of any claim then such shorter time limit shall be incorporated into these terms and conditions

     (ii)      Any additional exclusion of liability clause then same shall be incorporated mutatis mutandis into these

     (ii)      A different law and/or forum selection for disputes to be determined then such law selection and/or forum shall be incorporated into these terms and conditions

(c)   It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party

**M        BREACH/CANCELLATION**

M 1      Without prejudice to any other remedies and rights  the Seller shall have the option  immediately to cancel the Agreement in full or in part  or to store or procure the storage of the Bunkers  in whole or in part  for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred  or to hold the Buyer fully to the agreement  or take any other measures which the Seller deems appropriate without prejudice to its rights of indemnification  without any liability on the side of the Seller  in any one of (but not limited to) the following cases

  a)        when the Buyer  for whatever reason  fails to accept the Bunkers in part or in full at the place and time designated for delivery

  b)        when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC

  c)        when  before the date of delivery  it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller

  d)        when  in case of force majeure  the Seller is of the opinion that the execution of the agreement should be cancelled

M 2      The Seller may terminate any Agreement with the Buyer in whole or in part  in its full discretion  upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment  ceases to carry on business  makes an arrangement with its creditors or undergoes any form of bankruptcy  administration  re organisation or asset rearrangement

M 3      The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller  in its sole discretion  has reasonable grounds to believe that

  a)        The Vessel  or

  b)        The Charterer of the Vessel  or

  c)        The fully or partly Owner(s) of the Vessel  or

  d)        Any officers of the Vessel  or

  e)        The Operator and/or Manager of the Vessel  or

  f)        Any other person or entity in any way related to the Agreement or delivery is/are

  1)    Iranian(s)  or

  2)    Related in any way to Iran or Iranians  or

  3)    Listed on the US OFAC Specially Designated Nationals List  or

  4)    Covered by any US  UN  and/or EU sanctions  or

  5)    Covered by any sanctions of any other jurisdiction and/or administration

Under no circumstances can the Seller be held liable for any loss  delays  claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article

The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in comb nation with any of the above items 1) to 5) are fulfilled/apply

Should the Buyer breach its obligation to inform the Seller  the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach  including consequential or liquidated damages

M 4      The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law  including but not limited to the U S  Foreign Corrupt Practices Act ( FCPA )  and the UK Bribery Act  Therefore  the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not  and will not  offer promise  pay  or authorize the payment of any money or anything of value  or take any action in furtherance of such a payment  whether by direct or indirect means  to any public off c a  o  pr vate ind vidual to influence the dec s on of such pe so  n the performance of h s dut es to a government or to his company  Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties  making any claims for payment  delivery or any other obligation of the Seller under this Agreement void  The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence

**N        SPILLAGE  ENVIRONMENTAL PROTECTION**

N 1      If a spill occurs while the Bunkers are being delivered  the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill  Without prejudice to the

generality of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller but at the expense of the Buyer to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action All expenses claims costs losses damages liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission If both parties have acted negligently all expenses claims losses damages liability and penalties shall be divided between the parties in accordance with the respective degree of negligence The burden of proof to show the Seller's negligence shall be on the Buyer The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller or is required by law or regulation applicable at the time and place of delivery

## O        DELAYS AND CANCELLATIONS

O 1        Notwithstanding anything else to the contrary herein and without prejudice to any rights or remedies otherwise available to the Seller the Buyer by its acceptance of these conditions expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date

O 2        If the Buyer for whatever reason (including circumstances entirely outside Buyer s control) cancels the Agreement where Order Confirmation has been sent by Seller the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation including but not limited to barge costs re storing of the Bunkers and hedging costs and also in Seller s sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or if another buyer cannot be found any market diminution in the value of the product as reasonably determined from available market indexes These losses and liabilities shall be indemnified by a minimum amount of USD 4 000 by way of agreed minimum liquidated damages and shall be indemnified in full if they in total exceed USD 4 000

## P        LAW AND JURISDICTION

P 1        This Agreement shall be governed and construed in accordance with English law
The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply
Except for circumstance referred to in Clause P 5 below all d sputes arising in connection with this Agreement or any agreement relating hereto save where the Seller decides otherwise in its sole discretion shall be finally settled by arbitration in London England in accordance with the Arbitration Act 1996 (or any subsequent amendment)

P 2        In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller one by the Buyer and one by the two arbitrators already appointed Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the LLMA ) Either party may call for Arbitration by service of written notice specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s) then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator either party may apply to the English courts for the appointment of a third arbitrator
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise

P 3        Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator

P 4        In cases where neither the claim nor any counterclaim exceeds the amount of USD 100 000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced

P 5        The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien regardless of the country in which Seller takes legal action Seller shall be entitled to assert

its rights of lien or attachment or other rights  whether in law  in equity or otherwise  in any jurisdiction where the Vessel may be found

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them  any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port  place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York

P 6       If any procedure of any nature whatsoever is instituted under Clause P 5 above  in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement  the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys fees incurred in such proceeding

## Q        VALIDITY

Q 1       These terms and conditions shall be valid and binding for all offers  quotations  prices and deliveries made by the O W  Bunker Group  any associated company  representative or agent as of September 1 2013  or at any later date

Q 2       These terms and conditions are available at the website www.owbunker.com  on which site as well the Sellers may notify amendments  alterations  changes or verifications to same  Such amendments alterations  changes or verifications are deemed to be a part of the entire terms once same have been advised on the website